**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| | § | |
| **FEDERAL LAND BANK ASS'N OF** | § | |
| **SOUTH ALABAMA, FLCA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  07-2832** |
| | § | |
| **H & H WORLDWIDE FINANCIAL** | § | |
| **SERVICE, INC., BLACK MOUNTAIN** | § | |
| **ENERGY CORPORATION, K & T** | § | |
| **ENERGY & MINING CORPORATION,** | § | |
| **SABER MINING COMPANY, INC.,** | § | |
| **MUTUAL MONEY INVESTMENTS, INC.,** | § | |
| **d/b/a TRI-STAR FINANCIAL, PAUL** | § | |
| **HULSE, SR., MARIE FRANCES** | § | |
| **HULSE, PAUL HULSE, JR., FRANK** | § | |
| **TEERS, and JOHN R. CROUCH,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

**ORIGINAL COMPLAINT OF PLAINTIFF**
**FEDERAL LAND BANK ASS'N OF SOUTH ALABAMA, FLCA**

Plaintiff Federal Land Bank Association of South Alabama, FLCA hereby files its Original

Complaint herein: against H & H Worldwide Financial Service, Inc., Black Mountain Energy

Corporation, K & T Energy & Mining Corporation, Saber Mining Company, Inc., Mutual Money

Investments, Inc. d/b/a Tri-Star Financial, Paul Hulse, Sr., Marie Frances Hulse, Paul Hulse, Jr., and

John R. Crouch, and would show as follows:

<u>**Parties**</u>

1.      Plaintiff Federal Land Bank Association of South Alabama, FLCA (the "Bank") is a federally chartered cooperative association that is part of the Farm Credit System, with its principal place of business in Alabama.

2.      Defendant H & H Worldwide Financial Service, Inc. ("H&H") is a Texas corporation with its principal place of business in Texas. H&H may be served with summons herein by service on its registered agent, Steven P. Mock, at 3923 Rustic Woods Drive, Kingwood, Texas 77339 or at its registered office at 5821 Southwest Freeway, Houston, TX 77057.

3.      Defendant Black Mountain Energy Corporation ("Black Mountain") is a Texas corporation with its principal place of business in Texas. Black Mountain may be served with summons herein by service on its registered agent, Steven P. Mock, at 3923 Rustic Woods Drive, Kingwood, Texas 77339 or at its registered office at 4582 East Kingwood Drive, #114, Houston, TX 77345.

4.      Defendant K & T Energy & Mining Corporation ("K&T") is a Texas corporation with its principal place of business in Texas. K&T may be served with summons herein by service on its registered agent, Steven P. Mock, at 3923 Rustic Woods Drive, Kingwood, Texas 77339 or at its registered office at 4582 East Kingwood Drive, #114, Houston, TX 77345.

5.      Defendant Saber Mining Company, Inc. ("Saber") is a Kentucky corporation with its principal place of business in Texas. Saber has done business within the State of Texas so as to subject itself to long-arm jurisdiction in the State of Texas and in this Court. Saber has purposefully conducted business in Texas with Texas residents

(Defendants H&H and the Hulse Defendants) out of which the clams asserted against Saber herein arise. Specifically, Saber is controlled and operated by H&H and the Hulse Defendants from Texas, and Saber obtained funds loaned by the Bank to H&H from accounts of H&H maintained in Texas. Saber further knowingly spent such funds in a manner inconsistent with the Bank's agreements with H&H, pursuant to directions from H&H and/or the Hulse Defendants, Texas residents, in Texas, made both in person and by telephone, mail and other means of interstate communications. It is this tortious conduct that now gives rise in part to the Bank's causes of action against Saber. Therefore, jurisdiction by this Court over the Bank's claims arising out of Saber's business contacts with Texas is proper.  Saber may be served with summons herein by service on the Secretary of State of Texas pursuant to the Texas Long Arm Statute.  TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041–.045. The Secretary of State of Texas may provide notice of such service to Saber by certified mail to Saber's registered agent, Capitol Corporate Services, Inc., at 828 Lane Allen Road, Suite 219, Lexington, KY 40504.

6.      Defendant Mutual Money Investments, Inc. ("Tri-Star") is a corporation organized and existing under the laws of the State of Texas with its principal place of business in Texas. Tri-Star may be served with summons herein by service on its registered agent, William T. Payne, at 5718 Westheimer, Suite 170, Houston, Texas 77057.

7.      Defendant Paul Hulse, Sr. ("Hulse Sr.") is an individual citizen of the State of Texas and an owner, director and officer of H&H. Hulse may be served with summons herein by service on him at his business address at 3923 Rustic Woods Drive,

Kingwood, Texas 77339 or at his residence at 2215 Long Valley Drive, Humble, Texas 77345.

8. Defendant Marie Frances Hulse ("Ms. Hulse") is an individual citizen of the State of Texas and an owner, director and officer of H&H. Ms. Hulse may be served with summons herein by service on her at her business address at 3923 Rustic Woods Drive, Kingwood, Texas 77339 or at her residence at 2215 Long Valley Drive, Humble, Texas 77345.

9. Defendant Paul Hulse, Jr. Hulse ("Hulse Jr.") is an individual citizen of the State of Texas and President of H&H. Mr. Hulse may be served with summons herein by service on him at his business address at 3923 Rustic Woods Drive, Kingwood, Texas 77339 or at his residence at 4926 Middle Falls Drive, Humble, Texas 77345.

10. Defendant Frank Teers is an individual citizen of the State of Texas, and an officer of Defendant Tri-Star. Mr. Teers may be served with citation at his business address at 5718 Westheimer, Suite 710, Houston, Texas 77057.

11. Defendant John R. Crouch ("Crouch") is an individual citizen of the State of Alabama, and has done business within the State of Texas so as to subject himself to long-arm jurisdiction in the State of Texas and in this Court. Crouch has purposefully conducted business in Texas with Texas residents (Defendants H&H and the Hulse Defendants) out of which the clams asserted against him herein arise. Specifically, Crouch discussed and negotiated the Bank's credit agreements, pledge agreements, promissory notes, and other agreements with H&H, a Texas resident, in Texas, both in person and by telephone, mail and other means of interstate communications. It is these agreements and related tortious conduct that now give rise to the Bank's causes of action

against Crouch.  Therefore, jurisdiction by this Court over the Bank's claims arising out of Crouch's business contacts with Texas is proper.  Crouch may be served with summons herein by service on the Secretary of State of Texas pursuant to the Texas Long Arm Statute.  TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041–.045. The Secretary of State of Texas may provide notice of such service to Crouch by certified mail at his residence address at 1124 Hallwood Lane, Montgomery, Alabama 36117.

## Jurisdiction and Venue

12.     This Court has jurisdiction of this action under 28 U.S.C. § 1331 in that this is a civil action arising under the laws of the United States of America, including 15 U.S.C §78aa and 18 U.S.C. § 1964.   This Court has ancillary, pendent, and/or supplemental jurisdiction under 28 U.S.C. § 1367 over all claims alleged herein that arise under state law, in that all causes of action asserted herein are so related as to from part of the same case or controversy.

13.     Venue of this action in this Court is proper under 28 U.S.C. § 1391(b) in that one or more of Defendants may be found in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. .

## Facts

### I.    THE LOAN DEFAULT

14.     In December 2005, the Bank agreed to loan to H&H a principal amount of up to $90 million (the "Loan").  The Bank on or about December 14, 2005 consummated this Loan and advanced to H&H $68.5 million of that amount.   H&H has never

voluntarily repaid any of the principal of the Loan; however, on July 12, 2007, the Bank was granted the right to liquidate a securities account pledged as collateral for the Loan and, after application of the proceeds therefrom, $42,170,949.97 in principal plus unpaid interest and other amounts as are provided under the documents related to the Loan remain outstanding and unpaid to the Bank. The Loan is evidenced in part by an Amended and Restated Promissory Note, of which the Bank is the owner and holder, and an Amended and Restated Revolving Line of Credit Agreement (the "Credit Agreement"). The Bank has performed all of its obligations under the Loan, the Credit Agreement and the related documents (collectively, the "Loan Documents").

15.     As of July 2, 2007, the Loan was in default for a number of reasons known to the Bank, written notice of which was provided to H&H, including the persistent failure of H&H to provide required financial statements, the persistent failure of H&H to replenish collateral as required, the failure of H&H to make a payment to the Bank of approximately $1,245,000 when due on July 2, 2007, and the failure to pay ad valorem taxes on the real property mortgaged to the Bank by Black Mountain and K&T. Additionally, a number of circumstances have been discovered by the Bank, subsequent to July 2, 2007, which with the giving of notice and lapse of time would have constituted a default under the Loan.

16.     The Bank declared H&H in default by virtue of the known defaults and accelerated payment of the Loan on July 3, 2007, pursuant to the Credit Agreement and applicable loan documents. H&H has failed and refused to pay any of the amounts due under the accelerated Loan.  H&H has further refused to comply with the terms of the Credit Agreement.

**II**      **THE BACKGROUND OF THE LOAN**

17.      In the first half of 2005, Crouch was an employee and officer of the Bank. He met in Texas and elsewhere with, and/or conversed on multiple occasions with, Hulse Sr., Ms. Hulse, Hulse, Jr., Tri-Star and Teers. They discussed a potential loan to H&H by the Bank to finance the purchase of real estate in Kentucky.

18.      Crouch reported to the Bank that H&H was owned 50 % by Hulse Sr. and 50% by Ms. Hulse; that in 1992 Hulse Sr. had begun investing full time in United States Government bonds; and that Hulse, Sr. had grown those "AAA-rated investments to a mid nine-figure level." Crouch advised the Bank that, according to Defendant Tri-Star, Hulse Sr.'s: "basic organization format" was to "spread his extensive government bond and related investments" in to "over 20" ownership units that would each hold $80 million to $120 million of "similar government bonds plus other assets."

19.      Crouch recommended that the Bank agree to loan H&H at least $30 million. The proposed loan was to be closed in the late summer of 2005 and its proceeds used to purchase real estate in Kentucky, with loan advances being limited to 70 percent of the lesser of the purchase price or appraised value of the real estate to be purchased by H&H in the name of its subsidiary Black Mountain.  The loan was to be secured by the real estate purchased by H&H through Black Mountain and additionally collateralized by H&H's AAA-rated bonds in an amount such that the interest earned on the bonds would fully satisfy all debt service payments (whether interest only or interest and principal) on the loan. Crouch proposed that the Loan Documents require the bond collateral account to be maintained at Tri-Star to be reviewed periodically and that additional AAA-rated

bonds would be added to the collateral account as necessary to ensure that the interest on the bonds in the collateral account would fully service the debt service payments on the loan.

20.     Based on the information provided by Crouch, and by Hulse Sr., Hulse Jr., Tri-Star, Teers and others, the Bank approved (i) the initial $30 million loan to H&H (it closed and was funded in August 2005); and (ii) the subsequent $90 million Loan to H&H (it closed and was funded to the extent of $68.5 million in December 2005). Two entities newly formed by or at the direction of H&H and owned by H&H and/or the Hulse Defendants, Defendants Black Mountain and K&T, were used by H&H to acquire real estate financed by the Loan and were the mortgagors of the real property so acquired. A third H&H subsidiary, Saber, was created apparently to conduct mining operations on the property.  Through Saber, H&H has funneled many millions of dollars of proceeds of the Loan for various purposes.

21.     Crouch, as an experienced and trusted senior officer of the Bank, had responsibility to ensure that the Loan was substantiated with appropriate appraisals and collateral, completed and documented in a manner consistent with Bank practice and applicable federal regulations, and made in accordance with the Bank's approval of the Loan. However, he knowingly and willfully failed to fulfill these responsibilities.  In fact, Crouch purposely omitted, modified or re-stated almost all material aspects of the Loan's internal credit write-up (which he authored) in order to facilitate a loan closing and funding process that was in complete contravention of the foregoing recited standards. Tri-Star, Teers, Hulse Jr. and Hulse Sr., were complicit with Crouch in this entire process.

III.     __THE AUGUST 2005 LOAN OF $30 MILLION__.

22.     On or about August 13, 2005, the Bank made the initial loan to H&H of $30 million and funded the entire amount.  The only authorized purpose for the initial loan was to fund the purchase of real property and closing costs.  In fact, however, the proceeds of the initial loan were used as follows: (i) to purchase 5200 acres of real property (the "5200 Acres") in Harlan and Bell Counties, Kentucky in the name of Black Mountain at a price of $5.5 million; (ii) to purchase $16 million worth of securities deposited in the Account, as discussed below; and, (iii) the balance, approximately $8.5 million (the "$8.5 Million Balance") was disbursed to H&H.  The $8.5 Million Balance has been dispersed by H&H through bank accounts controlled by H&H to Saber, Black Mountain, Tri-Star and the Hulse Defendants and to other Hulse Defendant family members.  The Bank reasonably believes that some or all of the Defendants have received monetary benefits directly or indirectly in connection with inducing the Bank to make the $30 million loan.

23.     The value of the 5200 Acres purchased with proceeds of the initial loan of $30 million was substantiated by an appraisal prepared in a form which appears reasonably consistent with Bank policy and federal regulations (the "Woods Appraisal").  The appraised value established in the Woods Appraisal was $5.7 million.  Crouch ordered the Woods Appraisal, accepted it as submitted and was aware of its contents.  Crouch never disclosed in his internal write-up the actual appraised value established by the Woods Appraisal.  On the contrary, in an internal document known as a "Set-up Memo", Crouch falsely stated that the Woods Appraisal had established an appraised

value for the 5200 Acres of "$61,142,700".   As will be seen, Crouch repeatedly misrepresented/misstated the appraised value set forth in the Woods Appraisal.

24.     The loan was not made in accordance with the Bank's approval in that the $30 million advance was far in excess of 70 percent of the purchase price or appraised value of the real estate to be purchased with the loan proceeds; and, in fact, was in excess of nearly 600 percent of the purchase price of approximately $5.5 million.  In addition, at no time were proceeds of the Loan to be used to purchase securities of any type or provide operating funds for H&H.  The Loan also was not in accordance with the Bank's approval of the loan in that it was not collateralized by AAA-rated bonds in amounts sufficient to generate interest sufficient to service the quarterly debt service payments required under the loan.

25.     In addition to not complying with any of the approvals as outlined herein, the loan was not made in accordance with the express provisions of the Credit Agreement.  In fact, Crouch had the Credit Agreement prepared such that the 70% limit against the purchase price of the 5200 Acres was not required.  Accordingly, contrary to the Bank's approvals, the only limit contained in the Credit Agreement was 70% of the appraised value of the 5200 Acres.  The Bank believes that Crouch had the limitation for purchase price deleted because there was uncontroverted evidence readily apparent as to what the 5200 Acres purchase price was in the form of purchase agreements and closing statements that Crouch could not hide.  In other words, the purchase price could not be mischaracterized.  On the other hand, Crouch not only could hide and did hide the Woods Appraisal but, as demonstrated, Crouch could manipulate his approval documents to literally use whatever value as the Woods Appraisal value he saw fit.  At the initial $30

million closing, it appears that Crouch was content to simply increase the $5,700,000 number to $61,142,700 as has been recited above.   However, in the subsequent December, 2005 transaction, Crouch repeatedly and variously misstated the Woods Appraisal value as will be shown.

26.    At all times relative to the initial loan closing and funding, Crouch was aware of (i) the purchase price of the 5200 Acres being purchased; (ii) the appraised value set forth in the Woods Appraisal; and, (iii) that the initial loan funding was far in excess of the amount which would have been supported by applying the limit of 70% against either value: (a) $3,850,000 in the case of the purchase price (70% times $5,500,000); and (b) $3,990,000 in the case of the Woods Appraisal (70% times $5,700,000) .  Despite this knowledge and in complete derogation of his responsibilities, Crouch ignored the very limits he had described in the internal credit write-up he had authored and personally approved and authorized the initial loan funding of $30 million by, among other things, personally signing the wire transfer authorization for the Bank.

27.    As a material inducement to the Bank to make the Loan to H&H, H&H, Tri-Star, Teers, Hulse Sr., Ms. Hulse, Hulse Jr. and Crouch represented and/or led the Bank to believe that H&H owned and had paid for AAA-rated securities with a value of tens of millions of dollars; that such securities were then on deposit in Account No. 337540694 (the "Account") at Tri-Star; and, that such securities were then available to use as collateral for the loan to H&H. This was not in fact true. There were no securities in such Account when the representations were made to the Bank. However, in reliance on these representations, the Bank made the $30 million loan to H&H.

28.    These representations were false. In reality, the securities to be pledged

were not then in the Account as represented; were not then owned beneficially or of record by H&H and/or had not been paid for by H&H. Instead, the funds loaned by the Bank to H&H, were secretly wired to Tri-Star and were used by H&H, Hulse, Ms. Hulse, Hulse, Jr., Teers and/or Tri-Star to purchase securities to be placed in the Account after the date of the loan.  The Bank believes Crouch was also aware of this transaction and was fully complicit with the named Defendants in this process.

29.     The securities purchased by Tri-Star and placed in the Tri-Star account as collateral for the loan by the Bank to H&H after the Loan was closed were vastly different than had been represented to the Bank.   The value/liquidity of these securities was highly sensitive to interest rate changes.   Because of such sensitivity and the volatility in the market, these securities are classified as "derivatives".  The repayment of the principal of these securities was guaranteed by United States government agencies but their market value was not.  On the contrary, these securities were risky and their value was highly volatile, because they were mortgage-backed obligations known as "inverse floaters". The value and liquidity of such securities is highly sensitive to changes in short term interest rates, and also is dependent, among other things, on whether and when thousands of individual homeowners paid their subprime and other mortgages on a timely and consistent basis.

30.     The value and prospects for payment of these securities therefore were at best uncertain, and subject to wide swings depending on prevailing short-term interest rates and other factors not disclosed to the Bank.  In fact, the securities in the Account declined in value by millions of dollars during the period that they served as collateral for Bank loans to H&H.

31.    At all times, Crouch, H&H, Tri-Star, the Hulses and Teers were aware of the foregoing and fully complicit in inducing the Bank to (i) make the loan; and (ii) to unknowingly fully advance the proceeds of the loan in excess of all applicable requirements.  A substantial portion of these improperly funded excess loan proceeds were used to purchase the securities to be placed in the Account, and to provide H&H with millions of dollars of funds to be used at its discretion.

32.    All of this was hidden from the Bank through express misrepresentations, misstatements or purposeful omissions of material facts.  Not only did Crouch provide his misrepresentations to the Bank through his written statements, but he also knowingly provided such written misrepresentations in the form of a document he prepared known as a "Participation Analysis" to six separate financial institutions (the "Initial Participant Banks") which purchased an interest from the Bank in the initial $30 million loan in reliance thereon.   Essentially, then, Crouch and the other Defendant's express misrepresentations were made to induce the Bank to make the Loan and the Initial Participant Banks to purchase an interest therein.

33.    The Bank believes that Crouch acted in concert with the other Defendants but solely on his own and independently of all other Bank personnel in this regard.


IV.    **THE DECEMBER 2005 LOAN**.

34.    Having completed the improper $30 million loan in August 2005, the Defendants promptly began misleading the Bank into making a larger loan to H&H.  Again, Crouch conferred with H&H, Hulse, Sr., Hulse, Jr. Tri-Star, Teers and other

Defendants regarding the manner in which they would structure the proposed loan to mislead the Bank.

35.     Again, Crouch represented to the Bank that H&H was owned 50 % by Hulse Sr. and 50% by Ms. Hulse; that in 1992 Hulse Sr. had begun investing full time in United States Government bonds, and had grown those "AAA-rated investments to a mid nine-figure level." Crouch advised the Bank that, according to Defendant Tri-Star, Hulse Sr.'s "basic organization format" was to "spread his extensive government bond and related investments" in to "over 20" ownership units that would each hold $80 million to $120 million of "similar government bonds plus other assets." Crouch further wrote that H&H had assets as of September 30, 2005 of over $100 million and net worth of over $70 million.

36.     Crouch recommended that the Bank agree to loan H&H at least an additional $60 million creating the Loan described in Paragraph 14 above. The proposed Loan was to be used to (i) refinance the existing $30 million loan; and (ii) purchase additional real estate consisting of 3145 acres (the "3145 Acres") located in Muhlenberg County Kentucky, in the name of K&T at a price of $7.85 million, with additional loan advances for such purchase being limited to 75 percent of the appraised value of the 3145 Acres to be purchased by K&T.  According to Crouch, the Loan was to be secured by the 5200 Acres and 3145 Acres, the existing bonds in the Account and by $35 million (when it was fully funded at $90 million) in additional H&H bonds, such that the total amount of bonds would be approximately sufficient to insure that the interest earned on the bonds would fully satisfy all debt service payments to the Bank on the Loan.

37.     Crouch again proposed that the Bank require the bond collateral Account

to be maintained at Tri-Star, which he said was a subsidiary of Southwest Securities, Inc., a New York Stock Exchange firm, to be reviewed quarterly and that additional high quality bonds would be added to the Account as necessary to ensure that the interest earned on the bonds in the Account would fully satisfy the debt service payments on the Loan.  As part of the closing of the Loan, the securities held in the Account created in connection with the $30 million loan were to be supplemented by these additional bonds.

38.     Based on the information provided by Crouch, and by Hulse Sr., Hulse Jr., Tri-Star, Teers and others, the Bank approved the Loan to H&H.

39.     On or about December 14, 2005, the Bank made the $90 million Loan to H&H and advanced $68.5 million.  Because the Loan was not fully funded at $90 million at the closing, the Credit Agreement only required $20 million of additional securities to be placed in the Account in connection with this closing.  Proceeds of the Loan were properly used as follows:  (i) $30 million to pay off the August 2005 loan by the Bank to H&H; and (ii) $7.85 million was used to purchase the 3145 Acres.  However, contrary to the approvals and the terms of the Credit Agreement, additional proceeds of the Loan were improperly used to (x) purchase approximately $19.5 million in additional securities deposited in the Account; and, (y) the balance, after expenses, of approximately $10,000,000 (the $10,000,000 Balance") was disbursed to H&H.  The $10,000,000 Balance has been dispersed by H&H through bank accounts controlled by H&H to Saber, K&T, Black Mountain; Tri-Star and the Hulse Defendants and to other Hulse Defendant family members.  The Bank reasonably believes that some or all of the Defendants have received monetary benefits, directly or indirectly in connection with inducing Bank to make the Loan.

40.     The value of the 3145 Acres was substantiated by an appraisal (the "Cox Appraisal") but the Cox Appraisal was not prepared in a form and manner consistent with Bank practice and applicable federal regulations.  Indeed, the Cox Appraisal contains an "Extraordinary Assumption and Hypothetical Condition" which was inserted at the request of Crouch.   Based on this methodology, the Cox Appraisal made certain assumptions which were fatally flawed and Crouch knew this.  The result was that the Cox Appraisal set forth the appraised value of the 3145 Acres as $30,197,000.  At no time did Crouch disclose to the Bank that the Cox Appraisal was hinged almost entirely on such assumptions and conditions.  In fact, at no time did Crouch actually disclose in writing, **during either the underwriting process or prior to closing**, to the Bank or Participant Banks either the purchase price for the 3145 Acres or the Cox Appraisal value.  Crouch hid this vital information so that he could use different values in the process of justifying to the Bank and the Participant Banks the basis for the Loan and an aggregate advance of $68.5 million.

41.     In addition to failing to disclose material information relative to the basis of the Cox Appraisal, Crouch also prepared several written documents containing false information related to the 5200 Acres, used to induce the Bank and the Initial Participant Banks together with seven (7) additional participant banks (the Initial Participant Banks plus the seven (7) additional banks are collectively referred to as the "Participant Banks") to make the Loan.  In his Participation Analysis dated November 15, 2005, a document Crouch was the sole author of, Crouch misrepresented the appraised value established by the Woods Appraisal for the 5200 Acres as "$61,142,700" not the actual "$5,700,000".  In this same vein, the Bank has discovered numerous written documents prepared by

Crouch in connection with the Loan in which he represented at various times the appraised value of the 5200 Acres to be $50,342,700; $61,142,700; $100,392,702; and, $46,154,702.

42.     In this same Participation Analysis, the pivotal written instrument used to induce the Bank to make the Loan and the Participant Banks to purchase an interest therein, Crouch also appears to grossly overstate the appraised value of the 3145 Acres. At best, this portion of Crouch's document is confusing and misleading.  At worst, this portion of Crouch's document is an express misrepresentation of the Cox Appraisal.  In any case, it is clear that Crouch's document does not clearly or concisely state the Cox Appraisal value such that neither the Bank nor the Participant Banks would be misled as it relates thereto.  The Bank believes Crouch did this purposely so as to, in fact, mislead everyone as to the Cox Appraisal value.

43.     At all times relative to the Loan closing in December 2005, Crouch was aware of (i) the appraised values set forth in both the Woods Appraisal and the Cox Appraisal as he ordered the same and was in sole possession of the actual reports; and, (ii) that the additional new money being funded in the amount of $38.5 million was far in excess of the amount, under any analysis, which would have been supported by applying Crouch's stated limit of "75% of appraised value."   Using the Cox Appraisal value of $30,197,000, 75% would produce an advance of $22,647,750 not $38.5 million.

44.     Oddly, and without explanation, the Credit Agreement actually limits advances to 70% of appraised value and this provision should have further reduced the allowable advance of new money to $21,137,900, a difference of approximately $1.5 million.  Crouch knew at the time of the closing that the Credit Agreement limit was not

being adhered to as he personally authorized the wire transfer for the Bank's funding of the Loan.

45.     The Loan also was not in accordance with the Bank' approval of the Loan in that it was not collateralized by bonds in amounts sufficient to generate interest sufficient to service the quarterly debt service payments required under the Loan.

46.     As a material inducement to the Bank to make the Loan to H&H, H&H, Tri-Star, Teers, Hulse Sr., Ms. Hulse, and Hulse Jr. represented and/or led the Bank to believe that H&H owned and had paid for AAA-rated securities with a value of tens of millions of dollars; that such securities were on deposit in the Account, that such securities were then available to use as collateral for the Loan to H&H and were generating interest sufficient to pay the quarterly debt service payments due on the Loan.

47.     These representations were false. In reality, none of such additional securities were then owned beneficially or of record by H&H; and/or had not been paid for by H&H. Instead, approximately $19.5 million of the funds advanced by the Bank to H&H in connection with the Loan closing were secretly used by H&H, Hulse, Ms. Hulse, Hulse, Jr., Teers and/or Tri-Star to purchase securities to be placed in the Account after the date of the Loan.  Crouch was also aware of this transaction and was fully complicit with the named Defendants in this process.

48.     The nature of these additional securities and their undesirability and lack of suitability as collateral for the Loan is described in paragraphs 28 and 29 above.

49.     At all times, Crouch, H&H, Tri-Star, the Hulses and Teers were aware of the foregoing and fully complicit in inducing the Bank to make the Loan and the Participant Banks to purchase an interest therein, to fully advance the Loan's proceeds in

excess of all applicable requirements (including the very requirements that Crouch had set forth in his written descriptions, the Credit Agreement and applicable federal regulations), to purchase the additional securities to be placed in the Account, and to provide H&H with millions of dollars of funds to be used at its discretion.

50.     All of this was hidden from the Bank and Participant Banks through express misrepresentations, misstatements or purposeful omissions of material facts.  Not only did Crouch provide his misrepresentations to the Bank through his written statements but he also knowingly provided such written misrepresentations through his written Participation Analysis to the Participant Banks, which purchased an interest in the Loan in reliance thereon.  Essentially, then, Crouch and the other Defendant's express misrepresentations were made to induce the Bank to make the Loan and the Participant Banks to purchase an interest therein.

51.     The Bank believes that Crouch acted in concert with the other Defendants but solely on his own and independent of all other Bank personnel in this regard.


## V.     WRONGFUL  HANDLING  AND  USE  OF  THE  COLLATERAL  AND LOANED FUNDS

52.     Tri-Star maintained the Account in the name of the Bank. The Bank authorized Tri-Star to make quarterly payments to the Bank on the Loan to H&H out of interest earned on securities in the Account. However, Tri-Star exceeded and violated this authorization and the Pledge Agreement by making payments to the Bank in part out of principal repayments on the pledged securities without the Bank's authorization. This caused the principal in the Account that was collateral for the Loan to H&H to be

depleted without proper Bank authorization.

53.     In late 2006, the Bank became aware of Tri-Star's misconduct in this regard, and insisted that the next quarterly payment to the Bank be made only from interest that had been paid on securities in the Account. H&H agreed to this in writing in a letter dated December 7, 2006 that was signed by Hulse Sr. for H&H. Tri-Star nevertheless again violated the Bank's authorization and the Pledge Agreement by making the next quarterly payment to the Bank in material part from principal repayments on the securities in the Account. Tri-Star did not tell the Bank it was making the payment from unauthorized funds, and the Bank only discovered this fact for itself sometime later.

54.     When the Bank declared a default on the loan to H&H on July 3, 2007, Tri-Star and H&H were obligated under the Pledge Agreement and applicable law to allow the Bank to immediately take possession and control of the securities in the Account. However, Tri-Star and H&H failed and refused to do so. As a result, it was necessary for the Bank to retain attorneys and engage in costly litigation to enforce its rights to the collateral in the Account.

55.     On July 12, 2007, the Bank commenced an action in the 334th District Court of Harris County, Texas to seek judicial assistance in enforcing its rights to the collateral in the Account. After a hearing on that date at which Tri-Star and H&H were represented by counsel, the Court entered an order restraining Tri-Star, H&H, and others from interfering with the Bank's rights to immediate possession and control with respect to such collateral. Thereafter, the Bank took possession and control of the securities in the Account and liquidated such securities in a commercially reasonable manner. Despite

such action by the Bank, the value of the collateral had declined substantially because of the wrongful actions of Tri-Star and H&H.

56.     Part of the real estate collateral for the loans by the Bank to H&H was the timber growing on the real estate. H&H, Black Mountain, and K&T has limited rights to arrange for timber to be cut from the real estate collateral, but have exceeded their rights pursuant to arrangements with multiple firms or individuals to cut timber which was part of the Bank's collateral. On information and belief, Black Mountain has obtained over $1 million from such timber arrangements with respect to the Bank's collateral, without disclosure to the Bank and without the Bank's consent.

57.     As part of  the Bank's collateral, Black Mountain and K&T have granted the Bank a security interest in and lien on their personal property including equipment. On information and belief, both Defendants, acting individually or in concert with Saber, have  been secretly removing equipment from the real estate collateral and  have sold or disposed of the same by sale or trade to unidentified third parties in violation of their agreemnts with the Bank. The Bank has neither consented to any such sale(s) nor has it received any proceeds of its collateral sold thereby.


### FIRST CAUSE OF ACTION

### Federal Securities Law Violations

58.     The Bank incorporates all previous allegations of this Complaint.

59.     Crouch, H&H, Hulse Sr., Hulse, Jr., Tri-Star, and Teers employed, using instrumentalities of interstate commerce, a device, scheme or artifice to defraud the Bank in connection with the purchase or sale of securities, including the securities purchased

for inclusion in the Tri-Star Account that was collateral for the Bank's loans to H&H. In connection therewith, such defendants omitted to state material facts necessary in order to make statements made to the Bank, in the light of the circumstances in which they were made, not misleading to the Bank  Moreover, such Defendants engaged in acts, practices, or courses of business which operated as a fraud or deceit in the Bank. Tri-Star and Teers both committed such wrongful acts and aided and abetted such wrongful acts by Crouch, H&H, Hulse Sr., and Hulse, Jr.

60.     Such Defendants engaged in such acts with scienter, and with the intention to deceive or mislead the Bank, and such actions have proximately resulted in material damages to the Bank.

61.     Such Defendants are therefore liable to the Bank under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder

## SECOND CAUSE OF ACTION

### Civil RICO Violations

62.     The Bank incorporates herein all previous allegations of this Complaint

63.     Defendants H&H, Hulse Sr., Ms. Hulse, and Hulse, Jr. conducted or participated, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity.

64.     Such racketeering activity consists of fraud on a financial institution in violation of 18 U.S.C. § 1344; mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343.

65.     Such pattern of activity is evidenced by the fraud practiced on the Bank in connection with the August 2005 loan; the December 2005 loan; attempts to obtain from the Bank an additional loan to H&H in 2006; by repeated misinformation and non-disclosure to the Bank regarding the use of principal or principal repayments in the Tri-Star collateral Account to make quarterly interest payments on the loans by the Bank to H&H; by repeated misinformation and non-disclosure to the Bank regarding the need for H&H to add securities to the Tri-Star collateral Account in order to generate sufficient interest to provide funds sufficient to cover quarterly interest payments on the loans by the Bank to H&H; and by the repeated improper use of funds loaned by the Bank to H&H, including use of such loaned funds for the personal benefit of Hulse Sr., Ms. Hulse, and Teers. As just one example, not long after the December 2005 loan from the Bank to H&H was completed through the fraud described above, Hulse Sr. apparently used Bank funds loaned to H&H to treat himself, Ms. Hulse, Teers, and Teers' companion to a weekend trip from Houston to Las Vegas

66.     Such acts constituted violations of 18 U.S.C. § 1961 et seq., and the same were intended to and did proximately cause damages to the Bank in an amount far greater than one million dollars.

67.     Crouch, Tri-Star, and Teers conspired in such violations in violation of 18 U.S.C. § 1962(d), in that Tri-Star and Teers agreed to join in such pattern of racketeering activity and to participate in certain predicate acts, knowing that such acts were part of a pattern of activity prohibited by 18 U.S.C. § 1962.

68.     The Bank has been damaged in an amount greater than $ 42,000,000 by reason of the actions of such Defendants. Such Defendants intended to cause and did

cause the Bank to lend $ 68.5 million that the Bank would not have lent but for such wrongful actions of said Defendants. The Bank was the intended target of Defendants' wrongful actions, and such damage to the Bank was the preconceived purpose and intended consequence of the Defendants' wrongful actions, including the predicate acts of fraud on a financial institution in violation of 18 U.S.C. § 1344; mail fraud in violation of 18 U.S.C. § 1341; and wire fraud in violation of 18 U.S.C. § 1343. The Bank is entitled to recover all such damages from all such Defendants; to trebling of all such damages; to recover all income derived by such Defendants or by related persons or entities such as Defendants Black Mountain, K&T, Saber, and Tri-Star, and any amounts invested in such entities that is income from such unlawful activities; and to recover the Bank's reasonable costs of litigation herein, including attorney's fees.

### THIRD CAUSE OF ACTION

### Breach of Credit Agreements

69.     The Bank incorporates herein all previous allegations of this Complaint.

70.     H&H has materially breached its obligations to the Bank under the Credit Agreement.

71.     The breaches of the Credit Agreement by H&H have proximately caused damages to the Bank in an amount far in excess of $ 100,000, and the Bank is entitled to recover from H&H all such damages, and its expenses in enforcing the Bank's rights under the Credit Agreement, including reasonable attorney's fees herein pursuant to applicable law.

## FOURTH CAUSE OF ACTON

### Breach of Pledge Agreement by H&H and Tri-Star

72.     The Bank incorporates herein all previous allegations of this Complaint

73.     H&H and Tri-Star materially breached their obligations under the Pledge Agreement, including warranties made therein.

74.     The breaches of the Pledge Agreement by H&H and Tri-Star have proximately caused damages to the Bank in an amount far in excess of $ 100,000, and the Bank is entitled to recover from H&H and Tri-Star all such damages, and the Bank's expenses in enforcing its rights under the Pledge Agreement, including reasonable attorney's fees herein pursuant to applicable law.

## FIFTH CAUSE OF ACTION

### Fraud and Misrepresentation

75.     The Bank incorporates herein all previous allegations of this Complaint

76.     H&H, Tri-Star, Hulse, Jr., Teers, and Crouch made material written and oral representations to the Bank for the purpose of inducing the Bank to loan funds to H&H. Such representations were false, and were known by H&H, Tri-Star, and Hulse, Jr. to be false at the time the representations were made to the Bank. H&H, Tri-Star, and Hulse Jr. made such representations to the Bank with the intent to deceive the Bank.

77.     The Bank relied on such misrepresentations to its detriment by loaning funds to H&H, and has been materially damaged as a direct and proximate result.

78.     The Bank is entitled to recover from H&H, Tri-Star, and Hulse Jr. all actual damages proximately caused by such fraud and misrepresentation, which are far in excess of $ 100,000.

79.     The Bank is further entitled to recover from H&H, Tri-Star, and Hulse Jr. exemplary damages in an amount in excess of one million dollars each, because their acts of fraud and misrepresentation were undertaken intentionally and with malice, and/or with that state of mind for which the law permits imposition of such damages.


## SIXTH CAUSE OF ACTION

### Civil Conspiracy

80.     The Bank incorporates herein all previous allegations of this Complaint

81.     H&H, Tri-Star, Hulse Sr., Ms. Hulse, Hulse Jr. and Crouch conspired to defraud and make misrepresentations to the Bank, and to conceal the truth from the Bank for as long as possible.

82.     H&H, Tri-Star, Hulse Sr., Ms. Hulse, Hulse, Jr. and Crouch engaged in one of more overt acts in furtherance of such conspiracy. Such acts include, but are not limited to, failures and refusals to provide financial statements of H&H to the Bank; directing false or misleading communications to the Bank regarding such failures to provide financial statements; providing or directing the provision of false and misleading information to the Bank as to the fair market value of securities in the Account; and misleading the Bank as to the source of interest payments made to the Bank from funds in the Account.

83.     Such conspiracy and such acts in furtherance of such conspiracy have proximately caused damages to the Bank in amounts far in excess of $ 100,000, for which H&H, Tri-Star, Hulse Sr., Ms. Hulse, and Hulse Jr. are jointly and severally liable. The Bank is therefore entitled to recover from H&H, Tri-Star, Hulse Sr., Ms. Hulse and Hulse, Jr. all such actual damages.

84.     The Bank is further entitled to recover from all such Defendants participating in the conspiracy exemplary damages in an amount in excess of one million dollars each, because their acts of conspiracy were undertaken intentionally and with malice, and/or with that state of mind for which the law permits imposition of such damages.

### SEVENTH CAUSE OF ACTION

### Alter Ego/Single Business Enterprise

85.     The Bank incorporates herein all previous allegations of this Complaint

86.     Black Mountain, K&T, and Saber, although nominally separate entities from H&H, have in fact been and are alter egos of H&H, and of Hulse Sr., and Ms. Hulse as its owners. Moreover, H&H has been and is an alter ego of  Hulse Sr. and Ms. Hulse as its owners. Such Defendants used Black Mountain, K&T, Saber, and H&H for the purpose of perpetrating actual fraud and did perpetrate actual fraud on the Bank primarily for the personal benefit of H&H, Hulse Sr., and Ms. Hulse.

87.     H&H, Black Mountain, K&T, and Saber have been operated as a single business enterprise, and have integrated their resources to achieve an overall business purpose. Such integrated operations are evidenced by such entities having common

officers and employees, centralized accounting, services rendered by employees of one entity for the benefit of others and other commingling of the operations and finances of the entities.

88.     Accordingly, Black Mountain, K&T and Saber are obligated to the Bank for all obligations and liabilities of H&H to the Bank. Moreover, Hulse Sr. and Ms. Hulse are obligated to the Bank for all obligations and liabilities of H&H to the Bank.


## EIGHTH CAUSE OF ACTION

### Breach of Fiduciary Duty

89.     The Bank incorporates herein all previous allegations of this Complaint

90.     Crouch owed fiduciary duties to the Bank. These fiduciary duties included the duty to act in the Bank's interests in evaluating loan applicants and potential loans; in recommending potential loans to the Bank; in documenting and supervising the closing of loans for the Bank and related disbursements of loaned funds; and in administering loans for the Bank. Crouch owed the Bank duties of loyalty, candor, and care in connection with his services to the Bank, including all of his actions relating to H&H and other Defendants.

91.     Crouch materially breached his fiduciary duties to the Bank in connection with his actions relating to H&H and the other Defendants. Among other things, Crouch misinformed the Bank and failed to disclose to the Bank material information relating to H&H and Hulse, Sr. the proposed loans to H&H. On information and belief, Crouch acted not only negligently but also in bad faith toward the Bank with respect to the loans to H&H in that he knowingly misinformed the Bank regarding material facts relating to

H&H and such loans; knowingly failed to disclose to the Bank material facts regarding H&H that would have caused the Bank, had it known such facts, not to make the loans or to make the loans only on materially different terms, and/or to administer the loans to H&H in a materially different manner.

92.    Such breaches of fiduciary duty by Crouch proximately caused substantial damages to the Bank, as a result of losses on the loans to H&H and otherwise.

93.    The Bank is entitled to recover such damages and a constructive trust on all amounts or property obtained by Crouch and any others acting in active concert and participation with him in such breaches, and the Bank further is entitled to recover from Crouch exemplary damages in an amount in excess of one million dollars each, because his acts in violation  of his fiduciary duties were undertaken intentionally and with malice, and/or with that state of mind for which the law permits imposition of such damages.

## NINTH CAUSE OF ACTION

### Conversion and Misappropriation of Funds and Collateral

94.    The Bank incorporates herein all previous allegations of this Complaint

95.    H&H, Black Mountain, Tri-Star, Saber, Hulse Sr., and Ms. Hulse on information and belief misappropriated, improperly used, and converted to their own use funds loaned by the Bank and property that was collateral for the loans by the Bank to H&H. Such property included loan funds that were improperly used to purchase securities and fund commissions or spreads on such purchases, funds, securities, and income or proceeds from securities that were improperly used to fund personal

expenditures, and for other purposes other than those for which the loans were made by the Bank; and timber and other collateral, and proceeds therefrom that was improperly obtained without the Bank's knowledge and informed consent.

96.     The Bank is entitled to a full accounting as to such funds and collateral, to return and recovery of the same and all direct and indirect proceeds thereof; and/or the fair value thereof; and to imposition of a constructive trust and other equitable or injunctive relied as necessary to do justice to the Bank.

97.     The Bank is further entitled to recover from H&H, Black Mountain, Tri-Star, Saber, Hulse Sr., and Ms. Hulse exemplary damages in an amount in excess of one million dollars each, because their acts of fraud and misrepresentation were undertaken intentionally and with malice, and/or with that state of mind for which the law permits imposition of such damages.


## PRAYER

**WHEREFORE**, the Bank prays for relief as set forth above, and in particular for:

A.     Actual damages from all Defendants jointly and severally, in an amount far in excess of $ 100,000;

B.     Exemplary and treble damages from certain Defendants as set forth above, in an amount in excess of one million dollars each;

C.     Equitable relief, including accounting and constructive trust, and pre-and post-judgment interest;

D.     Reasonable attorney's fees and  expenses as set forth above; and

E.     Costs of suit and such other relief as may be appropriate.

Respectfully submitted,

**COX SMITH MATTHEWS INCORPORATED**
Attorney in Charge:
David Bryant
State Bar No. 03281500
Peter C. Hall
State Bar No. 24044224
1201 Elm Street, Suite 3300
Dallas, Texas 75270
Tel:  (214) 698-7800
Fax:  (214) 698-7899

**COX SMITH MATTHEWS INCORPORATED**
Leslie Sara Hyman
State Bar No. 00798274
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Tel:  (210) 554-5500
Fax:  (210) 226-8395

By: _____
    David Bryant

**ATTORNEYS FOR PLAINTIFF**
**FEDERAL LAND BANK ASSOCIATION**
**OF SOUTH ALABAMA, FLCA**